[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Both parties appeared, were represented by counsel, and proceeded on plaintiff's complaint dated October 3, 1994.
Having heard the evidence, the court finds as follows:
The plaintiff, whose maiden name was Carlson, and defendant whose first name is Jeffrey, intermarried at Biloxi, Mississippi, on January 9, 1982; that the plaintiff resided in the state of Connecticut for a period of twelve months next preceding the date of the filing of this complaint; that there are no minor children issue of the marriage; that no minor children have been born to the defendant since the date of the marriage; that the marriage has broken down irretrievably and that there is no hope of reconciliation. All statutory stays having expired, this court has jurisdiction.
The marriage of the parties began to deteriorate during September of 1994.
Plaintiff accused defendant of infidelity with Dan Cease, a neighbor, because of a telephone taped message he heard which allegedly contained an intimate conversation between the CT Page 14413 defendant and Dan Cease, and because of the numerous occasions defendant was at the home of Dan Cease.
Defendant denied any infidelity with anyone during her marriage to the plaintiff. However, she claimed that plaintiff was involved with Shirley Beckwith because she was driving the parties' 1989 BMW automobile when it was involved in an accident and that he was seeing her.
Plaintiff admitted seeing Shirley Beckwith on occasion, but denied any sexual or intimate relationship with her.
Also, each accused the other of a life style which adversely affected the financial stability of the marriage.
Notwithstanding whether any of the above was true, the accusations led to suspicions, distrust, arguments and verbal accusations resulting in plaintiff leaving the marital bedroom and the marital residence on September 28, 1994. The defendant voluntarily left the marital residence the end of September and moved in with her mother where she presently resides.
The court finds that the parties are equally at fault for the breakdown of their marriage.
The plaintiff, who was born March 6, 1961, and who appears to be in good health, graduated from the University of Connecticut in 1983 with a bachelor of science degree in electrical engineering. He has been employed since 1983 at the Naval Undersea Warfare Center (NUWC).
Plaintiff's present gross annual salary is $55,000. His net weekly earnings are, according to his financial affidavit dated December 11, 1995, is $684. Plaintiff does not contribute to any social security program, but his employment provides him with a civil service pension to which he contributes weekly.
In the near future, plaintiff's employer, NUWC, is relocating to Newport, Rhode Island. AS a result of this relocation, plaintiff plans to move to or near Newport, Rhode Island.
Defendant graduated from Eastern Connecticut CT Page 14414 University in 1984 with a bachelor of science in biology. She became employed in 1985 at Pfizer's and remained there for seven years until she resigned in 1992. She claimed she resigned because of the attitude of her supervisor. However, the supervisor was fired prior to defendant's resignation. While at Pfizer's, defendant worked for four different supervisors.
After Pfizer's, defendant became employed at Canberra Industries in Meriden, Connecticut, and remained there about two and one-half years. At Canberra, defendant was sexually assaulted in early 1994 and stayed out of work for approximately four to five months upon advice of her doctor.
In September 1994, defendant returned to work at Canberra Industries, but left there in February of 1995. Defendant remained unemployed from February 22, 1995 to May 22, 1995, when she became employed by Met Life, where she is presently employed as a case manager, handling disability claims. At Met Life, defendant's annual salary is $35,000. Her net weekly income, according to her financial affidavit (Plaintiff's Exhibit A) dated October 4, 1995, is $505.65. While at Pfizer's, defendant was earning $38,000 per year.
Defendant appears physically healthy but still suffers emotionally from the sexual assault she experienced more than one year ago.
As a result of stress developed while employed at Pfizer's and the sexual assault, the defendant received medical and psychological treatment regularly. Her medical insurance covered all medical expenses of her medical and psychological expense except for $75 per week.
In 1986, the parties purchased land with a down payment of $25,000; $10,000 was a gift from plaintiff's grandfather, $10,000, a loan from plaintiff's mother, and $5,000, a gift from defendant's aunt.
The marital home was built in 1987. Presently, the real estate is valued at $157,000 and is subject to a mortgage of $133,000, leaving an equity of $24,000.
On December 12, 1994, after the parties vacated the marital residence and while the premises remained vacant, the parties entered into an agreement allocating 60 percent of the CT Page 14415 monthly mortgage payment of $1,663.59 and the utility bills on the Salem property to the plaintiff, and 40 percent to the defendant.
The marital home (Salem property) was rented in March 1995 at a monthly rental of $1,300 plus utilities. The plaintiff collected rent totalling $13,000 to December 15, 1995. From said rentals, plaintiff paid $3,033 for insurance, maintenance expenses and a broker's fee, resulting in a net rental for said period of $9,967. (See Plaintiff's Exhibit G.)
The total mortgage payments and utilities for said period was $18,580. Deducting the net rental from $18,580 leaves a balance of $8,613. Pursuant to the 60/40 agreement the plaintiff is responsible for $5,167.80 of said amount and the defendant is responsible for $3,445.20.
From January 17, 1995 to December 11, 1995, pursuant to court orders, alimony payments due defendant was $6,000. Plaintiff only paid $588 alimony and credited the balance of $5,442 due defendant to her obligations under the 60/40 agreement. Since defendant's net obligation under said agreement was $3,445.20, plaintiff owes defendant unpaid alimony of $1,996.80.
In 1989, the parties refinanced the Salem property and received $35,000. With this money, plaintiff purchased the defendant a diamond ring for $11,100 cash; a 1989 BMW automobile for $33,000, with a down payment of $11,000 and a loan for $22,000 and loaned $10,000 to a friend. When this sum was repaid, plaintiff applied it to the loan on the BMW. The diamond ring was intended as a gift to defendant since plaintiff never gave her an engagement and wedding ring.
Plaintiff purchased a 1993 BMW automobile for himself and used $12,000 of defendant's inheritance from her aunt as the down payment on said car.
After plaintiff left the Salem property, he lived with his mother for a while, but as of April 1, 1995, he rented an apartment at a monthly rental of $800. In November 1994, plaintiff purchased a 1994 Harley Davidson motorcycle at a cost of $16,000. During March 1995, plaintiff sold his 1993 BMW for $9,000. Subsequently, plaintiff purchased a 1986 Mazda. CT Page 14416
The parties agreeably divided their personal property. However, after the plaintiff removed a gun collection from the Salem property, defendant purchased a gun for $1,176.56 (Plaintiff's Exhibit C) which plaintiff paid for. Defendant withdrew $2,869.65 from the Ledge Light Federal Credit Union account with which she paid joint bills and expenses of the parties.
Defendant not only was employed most of the time she and plaintiff were married, but she also performed the services of a homemaker for the plaintiff.
After considering the factors of Connecticut General statutes §§ 46b-81 and 46b-82, and taking into account all of the above, the following orders are entered, which the court finds to be fair and equitable.
(1) No alimony is awarded to either party.
(2) The plaintiff shall transfer all his right, title and interest in the martial premises to the defendant within sixty (60) days of this decree. During said period and up to the time plaintiff transfers his interest in said premises to the defendant, plaintiff shall account to the defendant for all rental income. Further, during said period, plaintiff shall not without prior written consent of the defendant, (1) expend any part of the rentals received, except to pay the mortgage, taxes, insurance and utilities; (2) enter into any lease or rental agreements for said premises; and (3) encumber said premises with any liens, mortgages, etcetera.
(3) Defendant shall have and own the 1989 BMW automobile free of any claims by the plaintiff, and defendant shall hold the plaintiff harmless from any claims thereon.
(4) Plaintiff shall own his Harley Davidson motorcycle and 1986 Mazda free of any claims by the defendant, and plaintiff shall hold the defendant harmless from any claims thereon.
(5) Each shall keep their own bank accounts, life insurance policies, retirement benefits and investments, all of which appear on their respective financial affidavits.
(6) Each shall pay the debts listed on their CT Page 14417 financial affidavits.
(7) Plaintiff shall pay to the defendant the unpaid alimony of $1,996.80 within ninety (90) days.
(8) Plaintiff shall pay to the defendant one half of her unreimbursed medical and psychological expenses within ninety (90) days after defendant submits to plaintiff a verified statement of said unreimbursed expenses.
(9) Plaintiff shall pay to the defendant by way of attorney's fees the sum of $1,500 within ninety (90) days of this decree as the denial of an attorney's fee award would undermine or impair other financial awards herein.
Vasington, J.